BILL LOCKYER Attorney General SUSAN DUNCAN LEE Deputy Attorney General
THE HONORABLE TOM HARMAN, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following questions:
1. Where voters of a charter city have approved a city employee pension plan prior to July 1, 1978, but collection of a property tax to pay for the retirement benefits is delayed until after July 1, 1978, is the collection of the tax subject to the one percent tax limitation of the Constitution?
2. Where voters of a charter city have approved a retirement benefit prior to July 1, 1978, to be offered to employees after July 1, 1978, is the collection of a property tax to pay for the retirement benefit subject to the one percent property tax limitation of the Constitution?
3 Where voters of a charter city have approved different levels of retirement benefits before and after July 1, 1978, what accounting method may be used for purposes of determining which costs are not subject to the one percent property tax limitation of the Constitution?
 CONCLUSIONS
1. Where voters of a charter city have approved a city employee pension plan prior to July 1, 1978, but collection of a property tax to pay for the retirement benefits is delayed until after July 1, 1978, the collection of the tax is not subject to the one percent property tax limitation of the Constitution.
2. Where voters of a charter city have approved a retirement benefit prior to July 1, 1978, to be offered to employees after July 1, 1978, the collection of a property tax to pay for the retirement benefit is not subject to the one percent property tax limitation of the Constitution.
3. Where voters of a charter city have approved different levels of retirement benefits before and after July 1, 1978, any reasonable accounting method may be used for purposes of determining which costs are not subject to the one percent property tax limitation of the Constitution.
 ANALYSIS
In June 1978, California voters approved Proposition 13, which added article XIII A to the Constitution. Article XIII A generally limits ad valorem ("according to value") taxes on real property to one percent of the value of the property, except that the one-percent cap may be exceeded in order to repay certain indebtedness, including indebtedness approved by voters prior to July 1, 1978. Section 1 of Article XIII A states in p
 "(a) The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.
 "(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any of the following:
"(1) Indebtedness approved by the voters prior to July 1, 1978.
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."
A tax in excess of the one-percent cap, imposed to pay voter-improved indebtedness, is frequently referred to as a "tax override" or "excess tax." (See, e.g., Howard Jarvis Taxpayers Assn. v. County of Orange (2003) 110 Cal.App.4th 1375, 1379-1383,1386-1388; Valentine v. City of Oakland (1983)148 Cal.App.3d 139, 142, 145.)
We are informed that prior to July 1, 1978, the voters of a charter city approved a retirement system for the benefit of city officers and employees. The three questions presented for resolution concern article XIII A's requirement that "indebtedness" be "approved by the voters prior to July 1, 1978" in order to qualify for the levy of a tax override.
1. Delay in Collecting the Tax
The first question deals with the city's initial collection of a property tax after July 1, 1978, to pay for retirement benefits that were approved by city voters prior to July 1, 1978. May a tax override be levied in such circumstances? We conclude that it may.
Preliminarily, we note that the phrase "to pay the interest and redemption charges on . . . [i]ndebtedness approved by the voters prior to July 1, 1978" (Cal. Const., art. XIII A, § 1, subd. (b)) has been interpreted to include voter approved public pension plans. The phrase is not limited to "traditional, fixed, long-term debt for borrowed funds." (Carman v. Alvord (1982)31 Cal.3d 318, 325.) Rather, it includes obligations arising under a city's pension plan for current and future city employees up to the level of benefits approved by the voters before July 1, 1978. (Id. at p. 325-333; Howard Jarvis Taxpayers Assn. v. County of Orange, supra, 110 Cal.App.4th at pp. 1381-1387; Valentine v. City of Oakland, supra, 148 Cal.App.3d at pp. 145-149.)
Significantly, it is not necessary that the voters approve the levy of the tax override itself for purposes of Proposition 13.[1]
All that needs to be approved prior to July 1, 1978, is the underlying "indebtedness" for which that tax override will be imposed. In Valentine v. City of Oakland, supra,148 Cal.App.3d 139, the court observed:
 ". . . Once the indebtedness is found to have had the voters' prior approval, ad valorem taxes etc. to pay the obligations arising thereunder are exempt, and there is no express requirement that such taxes need also be voter approved." (Id. at p. 149.)
Although Proposition 13 does not require voter approval of a tax override, we note that in November 1996, California voters approved Proposition 218, which added article XIII C and article XIII D to the Constitution. Section 2 of article XIII C provides:
 "Local Government Tax Limitation. Notwithstanding any other provision of this Constitution:
 "(a) All taxes imposed by any local government shall be deemed to be either general taxes or special taxes. . . .
 "(b) No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. A general tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved. . . .
 "(c) Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years of the effective date of this article and in compliance with subdivision (b).
 "(d) No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two — thirds vote. A special tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved."
In 1997, the Legislature enacted the Proposition 218 Omnibus Implementation Act, which interpreted various provisions of article XIII C and article XIII D. As part of the act, Government Code section 53750 was enacted to provide in part:
 "For purposes of Article XIII C and Article XIII D of the California Constitution and this article:
". . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "(e) `Extended,' when applied to an existing tax or fee or charge, means a decision by an agency to extend the stated effective period for the tax or fee or charge, including, but not limited to, amendment or removal of a sunset provision or expiration date.
" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "(h)(1) `Increased,' when applied to a tax, assessment, or property-related fee or charge, means a decision by an agency that does either of the following:
 "(A) Increases any applicable rate used to calculate the tax, assessment, fee or charge.
 "(B) Revises the methodology by which the tax, assessment, fee or charge is calculated, if that revision results in an increased amount being levied on any person or parcel.
 "(2) A tax, fee, or charge is not deemed to be `increased' by an agency action that does either or both of the following:
 "(A) Adjusts the amount of a tax or fee or charge in accordance with a schedule of adjustments, including a clearly defined formula for inflation adjustment that was adopted by the agency prior to November 6, 1996.
 "(B) Implements or collects a previously approved tax, or fee or charge, so long as the rate is not increased beyond the level previously approved by the agency, and the methodology previously approved by the agency is not revised so as to result in an increase in the amount being levied on any person or parcel.
 "(3) A tax, assessment, fee or charge is not deemed to be `increased' in the case in which the actual payments from a person or property are higher than would have resulted when the agency approved the tax, assessment, or fee or charge, if those higher payments are attributable to events other than an increased rate or revised methodology, such as a change in the density, intensity, or nature of the use of land.
". . . . . . . . . . . . . . . . . . . . . . . . . . . ."
We are informed that when the voters of the charter city in question approved the city employee pension plan prior to July 1, 1978, they authorized the city council to levy a tax override sufficient to meet all obligations of the city for the retirement system in which the city participated. Under the Legislature's implementing definitions, the fact that the tax override was not levied until after July 1, 1978, did not "extend" or "increase" the tax levy previously approved. The "level previously approved" by the voters (Gov. Code, § 53750, subd. (h)(2)(B)) was the rate in excess of one percent needed "to continue providing all retired, current, and future city employees with the retirement benefits to which city employees were entitled" at the time of the voter approval. (See Howard Jarvis Taxpayers Assn. v. County of Orange, supra, 110 Cal.App.4th at p. 1380.) Accordingly, the voter approval requirement of article XIII C of the Constitution was satisfied when the voters of the charter city authorized the tax override prior to July 1, 1978.
We conclude that where voters of a charter city have approved a city employee pension plan prior to July 1, 1978, but collection of a property tax to pay for the retirement benefits is delayed until after July 1, 1978, the collection of the tax is not subject to the one percent property tax limitation of the Constitution.
2. Delay in Offering Retirement Benefits
The second question is similar to the first, but it deals with a specific retirement benefit that was not actually offered to employees until after July 1, 1978, although approved by city voters prior to July 1, 1978. As with question one, we conclude that a tax override may fund such a retirement benefit in the described circumstances.
We reject the suggestion that if a retirement benefit is not offered until after July 1, 1978, it cannot constitute an "indebtedness" approved by the voters prior to July 1, 1978. A retirement benefit that is first offered after July 1, 1978, may be funded by a tax override as long as the granting of the benefit is in fact approved by the voters prior to July 1, 1978. All that is required, as indicated in response to the first question, is for the "indebtedness" (i.e., the "obligation" which in this case is the retirement benefit) to be approved by the voters prior to July 1, 1978, regardless of when the indebtedness actually accrues. (Howard Jarvis Taxpayers Assn. v. County of Orange, supra, 110 Cal.App.4th at pp. 1382-1383; Valentine v. City of Oakland, supra, 148 Cal.App.3d at p. 149.) As the Supreme Court stated in Carman v. Alvord, supra, 31 Cal.3d 318:
 "Plaintiff and taxpayers imply that subdivision (b) exempts only indebtedness which was fixed and certain when approved. But the subdivision imposes no such restriction. It speaks only of the time of approval, not the time an indebtedness is incurred or accrues." (Id. at p. 326, fn. 6.)
We conclude that where voters of a charter city have approved a retirement benefit prior to July 1, 1978, to be offered to employees after July 1, 1978, the collection of a property tax to pay for the retirement benefit is not subject to the one percent property tax limitation of the Constitution.
3. Different Levels of Benefits
The final question concerns the approval of different levels of retirement benefits by the voters of a charter city before and after July 1, 1978. What accounting method may be used in setting the amount of the tax override to cover only the benefits approved prior to July 1, 1978? We conclude that any reasonable accounting method may be used to separate the two levels of retirement benefits for purposes of calculating the amount of the tax override.
If voters do not approve the granting of retirement benefits before July 1, 1978, the costs of such benefits may not be funded by a tax override. (See Carman v. Alvord, supra, 31 Cal.3d at p. 331; Howard Jarvis Taxpayers Assn. v. County of Orange, supra,110 Cal.App.4th at pp. 1381-1387.) How are the costs of such benefits to be excluded when calculating the amount of the tax override?
A somewhat related question was presented in County of Orange v. Orange County Assessment Appeals Bd. (1993)13 Cal.App.4th 524, where the court examined whether a county assessment board had used the proper method of appraising property for purposes of assessing property taxes owed by a cable company. The court noted that more than one method of valuation could be "valid":
 " The County's attack is directed at the Board's method of valuation, so we and the trial court look to see whether, as a matter of law, the method was arbitrary, in excess of discretion, or in violation of the standards prescribed by law. [Citation.] In this regard we look not to whether another approach might also have been valid or yielded a more precise reflection of the property's value, but whether the method chosen was contrary to law. [Citations.] `The law requires only that an assessor adopt and use a reasonable method — neither a trial court, nor this court, can reject a method found by the board to be reasonable merely because, in [its] nonexpert opinion, another method might have been better.' [Citation.]" (Id. at pp. 529-530, fn. omitted.)
Similarly, in Concrete Pipe Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal. (1993)508 U.S. 602, the United States Supreme Court considered the propriety of an actuary's method of calculating an employer's share of certain unfunded pension plan liability. The court looked to "the scope of professional acceptability":
 ". . . Since the methodology is a subject of technical judgment within a recognized professional discipline, it would make sense to judge the reasonableness of a method by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation. Accordingly, an employer's burden to overcome the presumption in question (by proof by a preponderance that the actuarial assumptions and methods were in aggregate unreasonable) is simply a burden to show that the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary. In practical terms it is a burden to show something about standard actuarial practice, not about the accuracy of a predictive calculation, even though consonance with professional standards in making the calculation might justify confidence that its results are sound." (Id. at p. 635.)
Hence, as long as an actuarial method is "reasonable" and not "arbitrary" or "irrational," it may be applied even though other approaches may be equally correct or even "more precise" or "better." (See Concrete Pipe Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal., supra,508 U.S. at p. 635, fn. 20; Claypool v. Wilson (1992)4 Cal.App.4th 646, 680-681; Texaco, Inc. v. County of Los Angeles (1982)136 Cal.App.3d 60, 63.)
We conclude that where voters of a charter city have approved different levels of retirement benefits before and after July 1, 1978, any reasonable accounting method may be used for purposes of determining which costs are not subject to the one percent property tax limitation of the Constitution.
[1] While Proposition 13 does have a voter approval requirement for "special taxes" (Cal. Const., art. XIII A, § 4), this provision is inapplicable to ad valorem taxes on real property. (See Carman v. Alvord, supra, 31 Cal.3d at pp. 333-334.)